UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
AMSCAN INC. and PARTY CITY
CORPORATION,

                              Plaintiffs,                  **DECISION & ORDER**

            - against -                               13-CV-1112 (CS)

SHUTTER SHADES, INC. and DONALD T.
WILKERSON,

                              Defendants.
-------------------------------------------------------------------x

Appearances:

Paul Fields
Cameron Sean Reuber
Jonathan Webster Thomas
Leason Ellis LLP
White Plains, NY
*Counsel for Plaintiffs*

Todd Wengrovsky
Law Offices of Todd Wengrovsky, PLLC
Calverton, NY
*Counsel for Defendants*

Seibel, J.

     This case is a patent and trademark dispute concerning a type of novelty eyewear – sunglasses with six horizontal slats in place of lenses. Before the Court are the parties' cross-motions for summary judgment, which were filed on November 3, 2014. (Docs. 43, 47.)

1

## I. Background

The following facts, which are based on the parties' Local Rule 56.1 statements and responses, (*see* Ps' 56.1 Stmt. (Doc. 57); Ds' 56.1 Stmt. (Doc. 64)),[1] and supporting materials, are undisputed unless noted.

Plaintiff Party City Corporation ("Party City") is a large specialty party goods retailer that operates more than 800 brick-and-mortar stores throughout the United States. (Ps' 56.1 Stmt. ¶ 11.) Plaintiff Amscan, Inc. ("Amscan") is a large designer, manufacturer and distributer of decorated party goods and party accessories that distributes its products to thousands of retail outlets, including Party City stores. (*Id.* ¶ 9.) Defendant Shutter Shades, Inc. ("SSI") offers eyewear and t-shirts for sale on its website, shuttershadesonline.com. (*Id.* ¶¶ 14-15.) Defendant Donald Todd Wilkerson is SSI's founder, President, Chief Executive Officer and only employee. (*Id.* ¶¶ 12, 14-15; Wilkerson Dep. 52.)[2]

Sunglasses with slats over the eyes ("slotted sunglasses"), which were briefly trendy in the 1980s, (*see* Ps' 56.1 Stmt. ¶¶ 19-24), made a comeback in the summer of 2007 after popular rapper and recording artist Kanye West wore a pair designed by Alain Mikli in a music video and during a concert performance, (*see id.* ¶¶ 28-29, 95). In July 2007, after seeing Mr. Mikli's glasses on Mr. West, Defendant Wilkerson contacted Beverly Clark, the owner of Catwalk Enterprises ("Catwalk"), a company that creates promotional materials, to request her assistance in helping him obtain replicas of the glasses so he could sell them. (*Id.* ¶¶ 99-100; TW-1.)[3] Mr.

---

[1] "Ps' 56.1 Stmt." refers to Plaintiffs' response to the Rule 56.1 statement, (Doc. 49), filed by Defendants in support of their motion for summary judgment. "Ds' 56.1 Stmt." refers to Defendants' response to the Rule 56.1 statement, (Doc. 45), filed by Plaintiffs in support of their motion for summary judgment.

[2] "Wilkerson Dep." refers to the Deposition of Donald T. Wilkerson, which is attached as Exhibit E to the Declaration of Cameron S. Reuber, Esq. in Support of Plaintiffs' Motion for Summary Judgment, (Doc. 46 ("Reuber Decl.")).

[3] "TW" refers to the exhibits used in the Wilkerson Dep., all of which are attached as Exhibit F to the Reuber Decl.

Wilkerson emailed Ms. Clark a photograph of Mr. West wearing the glasses and asked her whether she knew "how to make replicas of these . . . [or] anyone here or overseas that can replicate these." (Ps' 56.1 Stmt. ¶¶ 95-96, 99-100.) Ms. Clark responded that her company could help Mr. Wilkerson arrange to have replicas of the eyeglasses manufactured in China. (*See* Wilkerson Dep. 28-48, 57-66; TW-1.)

On August 22, 2007, Wilkerson filed a federal "intent to use" trademark application for the mark "Shutter Shades" for usage in connection with sunglasses. (Ds' 56.1 Stmt. ¶ 1; *see* TW-15.) In September 2007, Mr. Wilkerson purchased 5,000 pairs of the glasses from Catwalk, launched his website and began selling the glasses through that site under the name "Shutter Shades." (*See* Wilkerson Dep. 24, 66, 71, 184-85; TW-5.) Mr. Wilkerson incorporated SSI on February 14, 2008. (Ps' 56.1 Stmt. ¶ 14.) He promoted SSI's brand by, among other things, advertising in magazines, (Wilkerson Dep. 218-24; TW-27, TW-28, TW-29), sponsoring events at nightclubs, (Wilkerson Dep. 243-46; TW-36; First Wilkerson Aff. ¶ 14),[4] attending trade shows, (First Wilkerson Aff. ¶¶ 8-10), and using social media, (*id.* ¶ 13).

On January 29, 2008, Mr. Wilkerson filed a design patent application entitled "Sunglasses Without Lenses but Having Six Horizontal Slats Crossing the Field of Vision of Each Eye" with the United States Patent and Trademark Office ("PTO"). (Ds' 56.1 Stmt. ¶ 2; *see* TW-7.) The PTO issued the design patent, Patent No. D590,868 (the "'868 Patent"), on April 21, 2009. (*Id.*; TW-8.)

On August 20, 2008, CTS Wholesale, LLC ("CTS"), an eyewear distributor, filed an opposition to Mr. Wilkerson's trademark application in which it argued that "shutter shades" was a generic term that had been used since as early as 1990 to refer to a particular type of sunglasses

---

[4] "First Wilkerson Aff." refers to Mr. Wilkerson's Affidavit in Support of Defendants' Motion for Summary Judgment of Trademark Infringement. (Doc. 50).

3

and that granting Wilkerson a registration for the mark would damage CTS by preventing it from using that generic name in the marketplace.  (P's 56.1 Stmt. ¶ 39; Wilkerson Dep. 176-77; TW-16.)  In a settlement agreement executed in 2009, CTS agreed to withdraw its opposition and refrain from filing any future oppositions in exchange for a royalty-free license from Defendants to continue using the "Shutter Shades" trademark.  (P's 56.1 Stmt. ¶ 43; Reuber Decl. Ex. J; Wilkerson Dep. 177-85.)  On November 30, 2010, the PTO granted Wilkerson a registration for the "Shutter Shades" mark, Reg. No. 3,883,243 (the "'243 Registration").  (P's 56.1 Stmt. ¶ 1; TW-15 at 24.)

In 2009, Defendants began sending demand letters to companies that were selling slotted glasses that Defendants believed used their design, informing the companies that they were infringing Defendants' intellectual property.  (Wilkerson Dep. 142, 154.)  In letters to 25 different companies that are dated between April 27, 2009, and May 8, 2009, Wilkerson wrote, "I ask that you immediately cease and desist of the manufacturing, importing, distribution and/or sales of these sunglasses and their respective derivative styles in all of your retail and online outlets."  (*See* TW-14.)  In letters dated between June 23, 2009, and March 8, 2011, Mr. Wilkerson informed a number of other companies that they were "current[ly] infring[ing] upon our Shutter Shades sunglasses design patents" and, rather than merely demanding that they cease their sales, offered them the opportunity to license the patents from him.  (TW-33; *see* Wilkerson Dep. 231-37.)  As a result of these efforts, between 2009 and 2012, Defendants entered into licensing agreements with six companies in each of which, in consideration for royalty payments, Defendants granted the company a license to use their design patents and to use the

"Shutter Shades" trademark in connection with the sale of patent-related products.[5]  (TW-19; TW-20; TW-22; TW-24; TW-25; TW-26.)

Defendants also sent several demand letters to Plaintiffs, who were selling pairs of slotted glasses that resembled Defendants' glasses.  On November 10, 2010, Defendants sent Amscan a letter that asserted that by selling "value packs of shutter glasses at Party City retail stores," it was infringing Defendants' design patent, and offered Plaintiffs the opportunity to license it.[6]  (TW-12; *see* Wilkerson Dep. 119.)  Almost two years later, on October 30, 2012, Defendants sent Plaintiffs an email, attaching the November 2010 letter and stating that SSI "owns a trademark for the term 'Shutter Shades' for eyewear, as well as owns two design patents for the Shutter Shades eyewear designs that Party City is currently using to market and sell on the PartyCity.com website and in Party City stores."[7]  (Reuber Decl. Ex. M at AMSCAN_0285-86.)  The email continued, "We are seeking to resolve the matter by requesting a one time payment for infringement damages dating back to our first letter to Party City in 2010 and a licensing

---

[5] Although the licensing agreements state that the license for the trademark (unlike for the patent) was "royalty free," (*see, e.g.*, TW-19 ¶ 2.2), the agreements also provide that the licensees' royalties are "[i]n consideration for the Patent *and Trademark* licenses granted hereunder," (*see, e.g.*, *id.* ¶ 3.1 (emphasis added)).  In any case, whether the trademark licenses are or are not "royalty-free" is not a material issue for purposes of my disposition of the instant motions.

[6] Defendants sent a demand letter on August 17, 2010 to Party City, (*see* Complaint ("Compl."), (Doc. 1), Ex. 6), and presumably received a reply directing them to contact Amscan (who provided Party City with its slotted glasses) directly.

[7] Plaintiffs admit that they have used the phrase "shutter shades" in connection with their sale of slotted eyeglasses in the past.  They explain that "Amscan Inc's 'Fun Shades' brand of slotted-glass eyewear is advertised, marketed, and available for sale in Party City's stores. . . .  On the sales racks, the phrases 'Shutter Shades Wht'; 'Shutter Shades Ylw; 'Shutter Shades Blk; [etc.,] were used as color designations."  (Affidavit of Don Chapin, Reuber Decl. Ex. D ¶¶ 10-12.)  Each pair of glasses had a hangtag that said "FUN SHADES" and "Amscan" on the front and "www.Amscan.com" and "Shutter Shades Prpl" (or another color designation) on the back.  (*Id.* ¶¶ 13-15, 18.)  The phrase "shutter shades" was also used on Party City's website in phrases including, "80's Black Shutter Shades," "Glitzy Girl Shutter Shades," "Old School Shutter Shades" and "Purple Shutter Shades" to describe different styles and colors of slotted eyeglasses available for sale  (*Id.* ¶¶ 19-21.)  Plaintiffs state, however, that since the commencement of this lawsuit, they have removed the phrase "shutter shades" from all new hangtags (although not from older ones in Party City stores' inventory) and from Party City's website.  (*Id.* ¶¶ 17, 22.)  Defendants have provided evidence that "Shutter Shades" appeared on the back of hangtags at Party City's Redwood City, California, location as of November 1, 2014, (*see* Doc. 62 ¶ 9), which is not inconsistent with Plaintiffs' representation that they are in the process of phasing out such hangtags.

agreement to use the trademark in associat[ion] with the sales and marketing of the shades going forward." (*Id.*; *see* P's 56.1 Stmt. ¶ 124.) There were further communications between the parties, (TW-13; P's 56.1 Stmt. ¶ 127; Compl. Exs. 10, 11; *see* P's 56.1 Stmt. ¶¶ 129-33; Wilkerson Dep. 107), but Plaintiffs never agreed to a licensing arrangement and instead commenced this lawsuit against Defendants on February 19, 2013.

Plaintiffs' Complaint asserts five claims, seeking (1) a declaration that Plaintiffs have not infringed the '868 Patent, (2) a declaration that the '868 Patent is invalid, (3) a declaration that Plaintiffs have not infringed the '243 Registration, (4) a declaration that the '243 Registration is invalid and (5) the cancellation of the '243 Registration pursuant to Sections 14 and 37 of the Lanham Act, 15 U.S.C. §§ 1064, 1119. Plaintiffs also request attorneys' fees and costs under 35 U.S.C. § 285 and 15 U.S.C. § 1117. In their answer, Defendants assert a counterclaim against Plaintiffs for trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114(1), and request costs and attorneys' fees. (Doc. 12 at 10-12.)

Both sides have moved for summary judgment. Plaintiffs move only on the claims that concern the '243 Registration (claims (3), (4) and (5)), and not on their patent-related claims. (*See* Doc. 43.) Defendants move on their trademark infringement counterclaim. (Doc. 47.) For the reasons stated below, Plaintiffs' motion is GRANTED and Defendants' motion is DENIED.

## II. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed

for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

### III. Analysis

The Court need only address a single issue, as it is dispositive of all of the claims on which the parties seek summary judgment: whether Defendants abandoned their trademark by engaging in "naked licensing."

"The owner of a trademark has not only the right to license the use of its trademark to others, but also a concurrent duty to exercise control and supervision over the licensee's use of the mark." *Patsy's Italian Rest., Inc. v. Banas* ("*Patsy's I*"), 508 F. Supp. 2d 194, 212 (E.D.N.Y. 2007) (internal quotation marks omitted). "The purpose of the control requirement is the protection of the public . . . [who] may be damaged by products that, despite their trademark, do not have the normal quality of such goods." *U.S. Jaycees v. Phila. Jaycees*, 639 F.2d 134, 140 (3d Cir. 1981). Inconsistent product quality is damaging because it may cause "the mark [to] lose its significance to consumers as the source of particular goods or services." *Patsy's Italian Rest., Inc. v. Banas* ("*Patsy's II*"), 575 F. Supp. 2d 427, 451 (E.D.N.Y. 2008).

When a licensor fails to exercise sufficient control over the quality of the product that its licensee sells under its mark, "such 'naked licensing' will result in abandonment." *Patsy's I*, 508 F. Supp. 2d at 212 (citing *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959)); *see Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 596 (S.D.N.Y. 2010) ("A 'naked license' is a license to use a trademark without sufficient quality control provided by the licensor. . . . [A] naked licensor may . . . be deemed to have involuntarily abandoned the rights to the mark."); *E.G.L. Gem Lab Ltd. v. Gem Quality*

*Inst., Inc.*, 90 F. Supp. 2d 277, 300 (S.D.N.Y. 2000) ("A licensor must exercise some degree of supervision over the licensee on pain of abandonment of the mark."), *aff'd*, 4 F. App'x 81 (2d Cir. 2001).  Because an assertion of insufficient control can lead to a forfeiture of rights, the party arguing for it must meet a "high burden of proof."[8]  *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir. 1983); *see Patsy's I*, 508 F. Supp. 2d at 212.

To avoid abandonment, a licensor must exercise a "reasonable degree of supervision and control over licensees under the facts and circumstances of the particular case." *Dawn Donut*, 267 F.2d at 367-68.  "The critical question in determining whether a licensing program is controlled sufficiently by the licensor to protect [its] mark is whether the licensees' operations are policed adequately to guarantee the quality of the products sold under the mark." *Gen. Motors Corp. v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 110 (2d Cir. 1986).  "The sort of supervision required for a trademark license is the sort that produces *consistent* quality." *Eva's Bridal Ltd. v. Halanick Enters., Inc.*, 639 F.3d 788, 790 (7th Cir. 2011) (emphasis in original).  If a licensor fails to play a "meaningful role" in holding its licensee's products to a standard of quality, it will be found to have abandoned its mark. *Barcamerica Int'l. USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 597-98 (9th Cir. 2002).

Plaintiffs argue that Defendants engaged in naked licensing of the "Shutter Shades" trademark because they exercised no supervision whatsoever over their licensees.  (Ps' Mem. at 6.)[9]  Defendants argue that, "given the simplicity of the products at issue, [they] took at least

---

[8] I will assume that this high standard of proof is that of clear and convincing evidence, *see Lifeguard Licensing Corp. v. Gogo Sports, Inc.*, No. 10-CV-9075, 2013 WL 4400520, at *3 (S.D.N.Y. Aug. 15, 2013), although some judges have found the preponderance of the evidence standard to be sufficient, *see FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515 (9th Cir. 2010).

[9] "P's Mem." refers to the Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment, (Doc. 44).

'reasonable measures' to prevent misleading uses of their trademark." (Ds' Opp. 10.)[10] The evidence in the record on Defendants' relationships with their licensees is limited. There are only the six licensing agreements that set out the formal terms of the licensing arrangements, the settlement agreement with CTS granting it a license to use the mark, Mr. Wilkerson's deposition testimony that he "speak[s] with [the] licensees frequently," (Wilkerson Dep. 187), and Mr. Wilkerson's statements via affidavit that Defendants "maintain contact with their licensees, are familiar with their licensees' products, . . . have no complaints about their license[e]s' product quality . . . [and] have indeed confirmed that their licensees' products meet Defendants' standards," (Second Wilkerson Aff. ¶¶ 2-3).[11] On this record, and making all justifiable inferences in Defendants' favor, *Anderson*, 477 U.S. at 255, no reasonable jury could find that Defendants adequately policed their licensees' operations so as to protect their mark.

First, Defendants' licensing agreements do not permit them to dictate product specifications, monitor manufacturing, inspect product samples or otherwise control any aspect of the quality of the eyewear sold by their licensees under the "Shutter Shades" mark.[12] When Mr. Wilkerson was asked, during his deposition, to identify any quality control provisions in these contracts, he pointed to four subparts: Paragraphs 6, 8, 12, and 14.[13] But none of these permits Defendants to exercise control over the quality of a licensee's glasses. (*See* Ps' 56.1 Stmt. ¶ 49.)

---

[10] "Ds' Opp." refers to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment of Trademark Invalidity and Non-Infringement, (Doc. 52).

[11] "Second Wilkerson Aff." refers to Mr. Wilkerson's Second Affidavit in Support of Defendants' Motion for Summary Judgment of Trademark Infringement. (Doc. 53).

[12] Indeed, it seems that Defendants believe that putting quality control requirements in contracts is either impossible or impractical. Mr. Wilkerson testified, with respect to his licensing arrangements, that "[w]hen working with third parties you can never control what they do." (Wilkerson Dep. 199.)

[13] Mr. Wilkerson testified that, aside from the provision setting the royalty amount, each of Defendants' six executed licensing agreements is "for the most part" identical – each contains the same sections and has the same quality control provisions. (Wilkerson Dep. 205, 210-11, 213-14, 217.)

10

- Paragraph 6 ("Sales Activities"), which states that the licensee shall "promote and sell the [glasses] in such a manner as it deems fit, in the sole discretion of [the licensee]," cuts, if anything, in the opposite direction, as it states that Defendants retain *no* control over these activities. (*See, e.g.*, TW-19 ¶ 6.)

- Paragraphs 8 ("Termination") and 14 ("Notices") have nothing to do with product quality; they simply set out the method by which Defendants and the licensee should communicate with each other (including in the event that one of them desires to terminate the agreement). (*See, e.g.*, *id.* ¶¶ 8, 14.)

- In Paragraph 12 ("Disclaimer of Liability and Indemnification") Defendants disclaim liability for the licensee's products and the licensee agrees to indemnify Defendants for any liabilities arising from the "workmanship or material" of those products. (*See, e.g.*, *id.* ¶ 12.1.) This is a disclaimer, not a quality control provision. *See Barcamerica*, 289 F.3d at 596 (trademark licensing contract that contained clause disclaiming licensor's products liability arising from licensee's sale of products bearing the mark "does not contain any controls or restrictions with respect to the quality of goods bearing the . . . mark.")

Defendants' settlement agreement with CTS, which granted CTS a license to use the "Shutter Shades" trademark in exchange for CTS's withdrawal of its opposition to Defendants' trademark application, also contains no quality control provisions whatsoever. (*See* Reuber Decl. Ex. J.) Indeed, this agreement is even more permissive because, unlike Defendants' six other licensing agreements, which licensed the trademark for use with "patent-related products" only, (*see, e.g.*, TW-19 ¶ 2.2), the settlement agreement permits CTS to use the mark with any type of product or service, (Reuber Decl. Ex. J ¶ 2; *see* Wilkerson Dep. 182-83). The absence – in any of Defendants' agreements – of an express contractual right to police the licensees' operations, while "not conclusive evidence of lack of control," *Barcamerica*, 289 F.3d at 596, "supports a finding of naked licensing," *Freecycle*, 626 F.3d at 516.

"[W]here courts have excused the lack of a contractual right to control quality, they have still required that the licensor demonstrate *actual* control through inspection or supervision." *Id.* at 516-17 (emphasis in original); *see Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 871 (10th Cir. 1995), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components*,

11

*Inc.*, 134 S. Ct. 1377 (2014); *Dawn Donut*, 267 F.2d at 368.  Plaintiffs argue that the record demonstrates that Defendants never supervised their licensees' operations nor inspected their products.  (*See* P's 56.1 Stmt. ¶ 47.)  Defendants' only attempt to dispute this fact is by citation to Mr. Wilkerson's testimony, (*id.*), in which, in response to a question about how he confirmed whether one of his licensees was still using the Shutter Shades mark, he said that he "speak[s] with [his] licensees frequently," (Wilkerson Dep. 187).  That testimony does not concern product quality.  Nor can Mr. Wilkerson's vague and conclusory statement in an affidavit that Defendants have "confirmed that their licensees' products meet Defendants' standards," (Second Wilkerson Aff. ¶¶ 2-3), create a triable issue of fact as to whether Defendants have ever inspected any of their licensees' eyeglasses or supervised their manufacture.  Even were one to interpret "confirmed" to mean "inspected" (which I do not), a reasonable jury could still not find that Defendants played a "meaningful role," *Barcamerica*, 289 F.3d at 597-98, in the supervision of their licensees where Mr. Wilkerson failed to provide any details about the methods or frequency of such inspections, *see id.* at 597 (wine company principal's testimony that he occasionally tasted licensee's wine failed to create a triable fact issue on naked licensing where principal "fail[ed] to state when, how often, and under what circumstances he taste[d] the wine").[14]  Likewise, and perhaps more fundamentally, the record is devoid of any evidence of the existence of any standards of product quality, let alone that Defendants police them.

Defendants also cannot create an issue of fact by claiming reliance on their licensees' own quality control measures to satisfy their duty of supervision.  At his deposition, Mr. Wilkerson stated his belief that the liability disclaimer in Defendants' licensing agreements

---

[14] My focus on Defendants' failure to provide evidence concerning inspections or other quality control measures does not mean that Defendants bear the burden to rebut Plaintiffs' allegation of naked licensing.  The burden of showing the absence of triable issues of fact remains with Plaintiffs, *see Warner Bros.*, 724 F.2d at 334, but they can meet it (and have done so) by citing the absence of evidence of quality control produced by Defendants in response to their discovery requests or otherwise present in the record.  (*See* Reuber Decl. ¶¶ 15-16; Doc. 58, Exs. A-D.)

12

"implies" that Defendants' licensees take quality control measures because Defendants "weren't going to take on any claims that came from [the licensee's] customers." (Wilkerson Dep. 130-31; *see id.* at 198-99.) While the disclaimer may have given Defendants' licensees an incentive to take quality control measures to protect themselves from products liability, Defendants could not justifiably rely on those measures for a different purpose – to produce slotted glasses of a quality consistent with their own (and those of the other licensees). Without any marching orders about the quality of "Shutter Shades" from the trademark owners, the licensees had no way of ensuring that all glasses sold under the mark were consistent enough to protect the mark's significance as an indicator of origin.[15] *See U.S. Jaycees*, 639 F.2d at 140; *Patsy's II*, 575 F. Supp. 2d at 451.

Furthermore, while it is true that "courts have upheld licensing agreements where the licensor is familiar with and relies upon the licensee's own efforts to control quality," *Barcamerica*, 289 F.3d at 596 (internal quotation marks and alteration omitted), there is no evidence suggesting that that is the case here. While Mr. Wilkerson states that he is "familiar with [Defendants'] licensees' products," (Second Wilkerson Aff. ¶¶ 2), he again supplied no details as to how he gained that familiarity, how often he updated his knowledge, or the aspects of his licensees' products with which he was familiar. His statement tells us nothing more than

---

[15] Additionally, to the extent the contract disclaimer could be said to have anything to do with product quality, Defendants do not claim to have relied on it to maintain *consistent* quality in their licensee's products but rather simply to maintain a *minimum* standard of quality. It was Mr. Wilkerson's belief that "as long as [the licensees] are held liable for any damages or claims, then it's presumed that the quality is *of marketable value*." (Wilkerson Dep. 199 (emphasis added).) That glasses sold under the "Shutter Shades" trademark met the minimum quality threshold to make them "marketable" does not guarantee the protection of the mark. "It is important to keep in mind that 'quality control' does not necessarily mean that the licensed goods or services must be of 'high' quality, but merely of equal quality, whether that quality is high, low or middle." *Barcamerica*, 289 F.3d at 598 (quoting McCarthy on Trademarks and Unfair Competition § 18:55 (4th ed. 2001)); *see Eva's Bridal*, 639 F.3d at 790 ("This argument that licensors may relinquish all control of licensees that operate 'high quality' businesses misunderstands what judicial decisions and the *Restatement* mean when they speak about 'quality.' There is no rule that trademark proprietors must ensure 'high quality' goods . . . . The sort of supervision required for a trademark license is the sort that produces *consistent* quality.") (emphasis in original).

that he knows his licensees make slotted sunglasses. There is no evidence Defendants had any familiarity with the quality of their licensees' products, let alone with their licensees' quality control procedures. Nor is there evidence that Defendants had the type of "close working relationship" that might entitle them to rely on their licensees to produce glasses of a quality consistent with their own. *See FreecycleSunnyvale*, 626 F.3d at 519; *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991) ("Where the license parties have engaged in a close working relationship, and may justifiably rely on each parties' intimacy with standards and procedures to ensure consistent quality, and no actual decline in quality standards is demonstrated, we would depart from the purpose of the law to find an abandonment simply for want of all the inspection and control formalities."), *aff'd sub nom.*, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992). Rather, the record suggests that Defendants' contact with their licensees was minimal and limited almost entirely to the collection of royalties.[16] (*See* Wilkerson Dep. 186-217.) Thus, Defendants cannot rely on the measures of others as their means of protecting their mark. And even if they could, "such reliance is *not alone sufficient* to show that a naked license has not been granted." *Freecycle*, 626 F.3d at 519 (emphasis in original); *see id.* at 519 n.7 ("licensor's confidence" in licensee insufficient absent "additional indicia of control").

    Finally, Defendants' argument that they satisfied their control duty based on the simplicity of their product is unconvincing. According to Defendants, because "plastic novelty

---

[16] Mr. Wilkerson suggested during his deposition that Defendants rely on the requirement that their licensees "maintain accurate records of their manufacturing of the products" as a quality control measure. (Wilkerson Dep. 199.) Presumably, Mr. Wilkerson is referring to Paragraph 4 of the licensing agreements ("Books and Records"), which provides that the licensee must "maintain accurate and up-to-date books and records of all activities relating to the manufacture, import, purchase, distribution and sale of the Patent Related Products." (*See, e.g.*, TW-19 ¶ 4.1) This paragraph does not, however, require the licensee to maintain any records that relate to product quality (such as product specifications, manufacturing logs or inspection reports) but only records of the data used to calculate the licensee's royalty payments – the number of products sold, to whom and at what price, all in enough detail to "enable an independent accountant . . . to certify as to the payments . . . made by [the licensee] hereunder." (*See, e.g.*, *id.* ¶¶ 4.1, 4.2.)

sunglasses [are] . . . simple products that do not entail moving parts, electronics, or machinery," their quality is "quite easy to ascertain, and Defendants have indeed confirmed that their licensees' products meet Defendants' standards." (D's Opp. 9-10.)  While it is true that the extent of the supervision that is required varies depending on "the facts and circumstances of the particular case," *Dawn Donut*, 267 F.2d at 367-68, including the nature of the product, *see Taffy Original Designs, Inc. v. Taffy's, Inc.*, No. 65-CV-345, 1966 WL 7124, at *9 (N.D. Ill. Oct. 31, 1966), and putting aside the absence of evidence of the existence of any such standards, Defendants seem to have provided no supervision whatsoever.  Even though Defendants' sunglasses do appear to be relatively simple products, there are still many factors that might influence whether consumers believe that glasses sold under the "Shutter Shades" mark originate from a single source, including their exact design (including the number of slats and their positioning), their sizing and dimensions, the type of materials used (including their thickness, heft and "feel"), the selection of colors and patterns available, the type of hinge mechanism used and the appearance and placement of the trademark on the glasses.  Because Defendants never exercised control over these or any other characteristics, they could not have ensured that their licensees' glasses met the "expectations created by the presence of the trademark." *Eva's Bridal*, 639 F.3d at 790 (internal quotation marks omitted); *id.* at 791 ("Trademark law requires that decisionmaking authority over quality remains with the owner of the mark. . . . Ours is the extreme case:  plaintiffs had, and exercised, *no* authority over the appearance and operations of defendants' business . . . .  That is the paradigm of a naked license.") (internal quotation marks and citation omitted, emphasis in original).

In conclusion, because there is no genuine dispute that Defendants did not exercise any contractual or actual control over their licensees' products, they have engaged in naked licensing.

As a result, they have abandoned their trademark rights.  This abandonment is ground for the cancellation of the '243 Registration under 15 U.S.C. §§ 1119 and 1064.  *See Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 873 (3d Cir. 1992); *see also Cent. Mfg., Inc. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007) ("Where, as here, a registrant's asserted rights to a mark are shown to be invalid, cancellation is not merely appropriate, it is the best course.").[17]  Plaintiffs are also entitled to a declaration that their sales of slotted glasses using the phrase "Shutter Shades" did not infringe Defendants' mark.[18]

## IV. Conclusion

For the reasons stated above, Plaintiffs' motion for summary judgment on their three claims related to the '243 Registration is GRANTED and Defendants' motion for summary judgment on its counterclaim is DENIED.  The Clerk of the Court is respectfully directed to terminate the pending motions.  (Docs. 43, 47.)  If Plaintiffs intend to pursue any of their remaining claims, they should so inform the Court by letter by May 15, 2015, or the remaining claims will be dismissed, judgment will be entered for Defendants on the trademark claims, and this case will be closed.

**SO ORDERED.**

Dated: April 30, 2015
         White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[17] Plaintiffs also argue that the '243 Registration is not entitled to protection because it is either a generic mark or a descriptive mark without secondary meaning.  (*See* Ps' Mem. 8-14.)  Although I need not reach this issue, I note that there is some evidence in the record suggesting that "shutter shades" either was, or has become, a generic name for a type of glasses rather than an indicator of glasses produced by Defendants or their licensees.  (*See* P's 56.1 Stmt. ¶¶ 58-63.)

[18] Defendants' mark has been abandoned since at least 2009, when Defendants granted their first naked license, (*see* Wilkerson Dep. 184-85; TW-19), and Defendants do not allege that Plaintiffs' infringed their trademark until 2010, (*see* Ds' 56.1 Stmt. ¶¶ 5, 7).